UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KENNETH J. THOMAS,<br><br>      Plaintiff,<br><br>v.<br><br>ISTAR FINANCIAL, INC., a Maryland corporation, and ED BARON,<br><br>      Defendants. | Case No. 05-CV-0606<br>(VM) ECF<br><br>**COMPLAINT** |

Plaintiff, Kenneth J. Thomas, sues Defendants IStar Financial Inc. and Ed Baron, and alleges:

### Introduction

1.  This is a racial discrimination and retaliation action by Kenneth J. Thomas against his former employer, IStar Financial Inc. and manager Ed Baron, who subjected Plaintiff to racial discrimination and retaliation. Plaintiff sues for damages pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., as amended by the Civil Rights Act of 1991, and New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-107(1)(a) and (16), and invokes the Court's supplemental jurisdiction for the New York City Human Rights Law claims. Plaintiff additionally seeks punitive damages and his litigation expenses and a reasonable attorney's fee.

### Jurisdiction

2.  This action arises under Title VII of the Civil Rights of 1964, 42 U.S.C. §§ 2000e, et seq. Jurisdiction is founded on 42 U.S.C. §§ 2000e-5(f)(3), 28 U.S.C. §§ 1331 and 1343(3)

1

and (4). The Court has supplemental jurisdiction over the New York City Human Rights Law claims.

3. Venue is proper in the Southern District of New York, pursuant to 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1391(b), because the claim arose there.

**Parties**

4. Plaintiff, Kenneth J. Thomas (hereafter "Mr. Thomas" or "Plaintiff"), at all times material was employed as an accounting assistant and accounts payable manager by IStar Financial Inc. Thomas is a member of three classes protected by Title VII of the Civil Rights Act of 1964, in that he is black, African-American, and he protested acts made illegal by Title VII.

5. Defendant, IStar Financial Inc. (hereafter "Defendant" or "IStar") is a Maryland corporation, with its principal place of business located in New York, New York. At all times material, Istar employed more than fifteen persons, and was an "employer" as envisioned by 42 U.S.C. § 2000e(b) and the New York City Human Rights Law.

6. Defendant, Ed Baron (hereafter "Defendant" or "Mr. Baron"), at all times material, was a manager of Istar with supervisory authority over Plaintiff. As to Plaintiff's New York City Human Rights Law claims, Baron is sued in his individual capacity.

**Compliance With Procedural Requirements**

7. Plaintiff timely filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") on or about November 25, 2003, alleging race and color discrimination and retaliation.

8. The Department of Justice, Equal Employment Opportunity Commission, issued

2

Plaintiff a Notice of Right to Sue dated November 8, 2004, thereby entitling Plaintiff to file a civil action in this Court.

9. Prior to the commencement of this action, plaintiff served a copy of this complaint on January 12, 2005, upon the New York City Commission on Human Rights and the Corporation Counsel of the City of New York, in accordance with N.Y.C. Admin. Code Section 8-502(c).

### General Allegations

10. Mr. Thomas worked for iStar as an accounting assistant in the accounts payable department from June 1, 2000 until February 28, 2001. On March 1, 2001, Mr. Thomas was promoted to the Accounts Payable Manager. Prior to joining IStar, Mr. Thomas had substantial business experience, and an accounting degree.

11. During his employment at IStar, Thomas was a diligent and hard-working employee. In recognition of this fact, he received substantial bonuses and stock options at the end of each year, in 2000, 2001, and 2002. He took off very little time for vacation or personal days. He was verbally praised by his supervisors each year.

12. Nevertheless, during his employment at iStar, Mr. Thomas was subjected to negative racial comments and disparate treatment by the vice president of administrative and corporate services Mr. Baron as well as other co-workers, which created a hostile work environment. In addition, he was subjected to harsher disciplinary action than white employees. He was retaliated against for complaining about the discriminatory treatment, and he was terminated in August 2003 for pretextual reasons that were motivated primarily by discriminatory attitudes.

13. Soon after Mr. Baron joined iStar in about March 2001, it became very clear that – based upon his comments and actions – Mr. Baron had prejudiced and stereotyped views of African-Americans and blacks as well as other minorities. For example:

A. When Mr. Baron first met Mr. Thomas, Mr. Baron told Mr. Thomas - "well you may like me now, but in a month you will hate my guts."

B. In a meeting soon after Mr. Baron started, Mr. Baron called Mr. Thomas into his office. He started asking Mr. Thomas personal questions about his finances. He wanted to know how Mr. Thomas could afford to have a Jaguar automobile, a house, and pay child support. He told Mr. Thomas - you cannot bullshit me, because I was raised in the streets just like you. He said that he knew what it was like to be discriminated against, because he was gay. Mr. Thomas told Mr. Baron that he had not been raised in the streets and that his comments were inappropriate.

C. Mr. Baron had a pattern and practice of making similar comments to other black employees at the company, including black employees in other offices. When Mr. Baron would introduce himself to black employees, he would tell black employees that he could identify with their ethnicity; he knows what it is like to grow up poor; some of his best friends are black; he comes from where you come from; and he grew up in the hood, poor and on welfare – even though these employees may never have grown up in the hood, may never have been poor, and may never have been on welfare.

D. During Mr. Thomas' employment, Mr. Baron made numerous other racially-stereotyped comments about blacks and other minorities.

E. On one occasion, Mr. Baron told a black employee that he did not like the

4

employee's attitude and that the employee has to try harder because blacks are worse off than everybody else.

  F. On another occasion, Mr. Baron told a black employee that he did not like the look on the employee's face, and that we have done so much for you.

  G. On another occasion, Mr. Baron told a black employee that the employee has to understand that the employee is a minority, that the employee is a "nigger," and that he is going to outlast the employee at the company.

  H. On another occasion, Mr. Baron interrogated Mr. Thomas about the fact that he was friends with another employee who was Hispanic. Mr. Baron asked Mr. Thomas why he would want to have a relationship with that woman, and Mr. Baron referred to the hispanic employee as a "street-rat."

  I. On another occasion, when referring to a hispanic vendor, Mr. Baron told Mr. Thomas that he did not like dealing with "those Mexicans," because he did not understand them, even though they were not Mexican.

  14. Mr. Baron had supervisory and managerial authority over Mr. Thomas, and he had the ability to, and did, recommend and carry out personnel decisions with respect to Mr. Thomas and other persons within Mr. Thomas' department.

  15. After Mr. Thomas became accounts payable manager, Mr. Baron transferred Amy Carlson (formerly Amy Aldridge), who was then working as a receptionist, to help Mr. Thomas with filing and other duties in the accounts payable department.

  16. Mr. Baron was clearly looking for grounds to terminate Mr. Thomas. He often asked Ms. Carlson if Mr. Thomas was doing anything to make her uncomfortable. He told Ms.

Carlson that he would get rid of Mr. Thomas if Ms. Carlson was unhappy.

17.     On one occasion, in August 2001, Mr. Carlson told Mr. Thomas that she wanted his job as accounts payable manager. She said that she was tired of answering the phones, and she wanted to learn more. She said that Ed Baron is firing a lot of blacks, and that the company will fire him before her because she is white, and he is black.

18.     On another occasion, Mr. Thomas gave Ms. Carlson an assignment. She told Mr. Thomas that she does not like working for blacks. She said that Ed will fire him and protect her because he is black.

19.     On another occasion, in violation of company policies, Ms. Carlson sent Mr. Baron a copy of Mr. Thomas' check request for deduction of his child support payments from his payroll check. This was a violation of company policy, because such a request is considered confidential personal information, and should only have gone to Mr. Thomas' official direct supervisor Andrew Barker or Colette Tretola. When Mr. Thomas complained that Ms. Carlson had violated company policy by improperly sharing confidential personal information, no disciplinary action was taken against her. Moreover, as expected, Mr. Baron used the information to further interrogate Mr. Thomas about his personal life.

20.     Negative racial attitudes toward blacks, set by the top management, pervaded the company, and Mr. Thomas was made to feel like a lesser person. For example, when something was stolen or missing, Mr. Thomas was the first person who the management questioned. In one incident, when there was an incident of check fraud in the Georgia office, Mr. Baron immediately confronted Mr. Thomas and said - you have to have something to do with it.

21.     Other employees made negative racial comments to Mr. Thomas. On one

occasion, a senior accountant, Jai Agarwal, addressed Mr. Thomas, by saying: "What's up my nigger?" When Mr. Thomas objected, Mr. Agarwal said that he thought that's how you people address each other. When Mr. Thomas discussed the incident with Mr. Agarwarl, he expressed his views about black people, saying that not all black people are bad. Mr. Agarwal said that he was not going to worry about it any more, because Mr. Thomas was on "a five-year plan" anyway, indicating that Mr. Thomas was not going to be with the company much longer.

22. Mr. Thomas complained on numerous occasions to the human resources department and the accounting manager Andrew Barker about these comments and treatment. No adequate corrective action was taken. Rather, Mr. Barker told Mr. Thomas to just overlook it.

23. In August 2001, Mr. Thomas accidently received an e-mail which the human resources administrator Ayanna Shanks had apparently intended for the human resources senior vice president Geoff Dugan.

24. In that e-mail, Ms. Shanks stated that Mr. Baron had told Ms. Shanks that someone had approached Mr. Baron and told Mr. Baron that Mr. Thomas said that Mr. Baron was picking on black people at the company. Mr. Thomas immediately informed Ms. Shanks and Mr. Dugan that he had accidently received the e-mail. Mr. Thomas was upset that the issue had not been discussed with him first.

25. Mr. Dugan told Mr. Baron about the e-mail, and soon after the incident Mr. Baron told Ms. Carlson that she should learn Mr. Thomas' job duties because Mr. Baron was going to try to get Mr. Thomas out because he was starting trouble. Mr. Baron's negative treatment of Mr. Thomas worsened after this incident.

26. During his employment, Mr. Thomas was also treated in a disparate manner concerning his compensation. Although he was promoted to accounts payable manager, his base salary level was kept well below the level accorded to other non-black manager level employees.

27. The company's disposition against black employees, particularly after Mr. Baron started with the company, is also demonstrated by the fact that when Mr. Baron started, there were 5 other black employees in the New York City office. During Mr. Baron's tenure, four black employees were caused to be fired or to resign. When Mr. Thomas was let go, there was only one black employee left in the New York City office.

28. As expected, based upon his prejudices against Mr. Thomas and other black employees, during the last 2-3 months of Mr. Thomas' employment, Mr. Baron found pretextual reasons to cause his termination. In one situation, Mr. Baron complained to Steven Semet, who was filling in for Colette Tretola, that Mr. Thomas was rude to a vendor, which was not the case. In fact, the vendor had called because he was upset that he had not been paid for eight months. Mr. Thomas had simply asked the vendor to fax the invoice again.

29. In another situation, Nancy Zoeckler, the vice president of leasing in the Georgia office, asked Mr. Thomas to help with an emergency project to pull some files on an expedited basis for the auditors on a Friday, which was Mr. Thomas' busiest day because he had to cut checks. Ms. Zoeckler called Tim O'Connor to ask if the people in corporate services could assist on the project, which they did. As a result, Mr. Thomas and Ms. Carlson were able to get the project completed within 2 ½ hours. Ms. Zoeckler congratulated Mr. Thomas by e-mail for an excellent job and cooperative spirit. Nevertheless, the next Monday, Mr. Baron and Ms. Tretola called Mr. Thomas into their office, complaining that other people had to get involved,

8

and they told him not to discuss the incident with anyone.

30. In a third situation, a check was sent by one of the corporate accountants, Gerri Gemblazo, to the wrong address and without a cover letter. Mr. Thomas was called into Ms. Tretola's office to meet with Mr. Baron and Ms. Tretola. Mr. Tretola indicated that she had talked to Mr. Baron, and that she had to let him go. Ms. Tretola mentioned this check and another incident in 2002, in which Ms. Carlson had failed to properly note a duplicate payment in the computer system. When Mr. Thomas protested by saying he didn't have anything to do with this, Mr. Baron smiled at Mr. Thomas with an expression that clearly said - "I got you."

31. The company's termination of Mr. Thomas violated its own disciplinary procedures and the disciplinary procedures applied to white employees, which required three verbal warnings prior to termination.

32. The pretextual nature of the termination is also demonstrated by the fact that the company has already given inconsistent stories about the reasons for Mr. Thomas' termination. On the one hand, the company told Mr. Thomas that he was fired due to poor work performance. On the other hand, the company told other employees in an e-mail that Mr. Thomas voluntarily left the company to pursue other opportunities.

33. Mr. Thomas has suffered severe emotional distress and well as severe financial hardship and disruption to his life as a result of the hostile work environment, disparate treatment, pretextual termination, and retaliation.

34. Despite his diligent efforts, Mr. Thomas has been unable to find new employment. When potential employers have called the company for references, on information and belief, the company has given negative references, or refused to give information, which has sent a clear

negative signal to potential employers.

35. As Mr. Baron was well aware at the time he terminated Mr. Thomas, Mr. Thomas was in the process of buying a house and Mr. Thomas has sole responsibility for the care and support of a young daughter. As a result of his loss of employment, Mr. Thomas lost the house he was going to purchase, and he has had little income to help to support his daughter.

36. Furthermore, the mistreatment, termination, and loss of employment have caused Mr. Thomas severe emotional distress.

37. By allowing Mr. Baron to continue administrative supervision over Mr. Thomas after the claims were first reported by Mr. Thomas, iStar gave Mr. Baron the actual and/or apparent authority to continue to affect the terms and conditions of Plaintiff's employment.

38. Defendants' actions were undertaken maliciously and with reckless disregard for the rights of Plaintiff.

## Count I/Title VII Claim for Hostile Environment

39. Plaintiff realleges and adopts, as if fully set forth in Count I, the allegations in ¶¶ 1 through 38 above.

40. The acts more particularly alleged in ¶¶ 11 through 30, constitute hostile-environment discrimination as proscribed by Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991.

41. The adverse treatment to which Plaintiff was subjected was based upon his being black and African-American.

42. The conduct of Defendant deprived Plaintiff of his statutory rights under 42 U.S.C. § 2000e, et seq., i.e., Plaintiff, by being subjected to the adverse treatment more

particularly alleged above was affected in a "term, condition or privilege" of employment.

43. As a direct, natural, proximate and foreseeable result of the actions of Defendant, Plaintiff has suffered past and future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.

WHEREFORE, Plaintiff prays that this Court will enter a judgment for Plaintiff and against Defendant iStar for the following relief:

A. An award of damages, including but not limited to loss of wages, benefits, and promotional opportunities, and reinstatement or an award of front pay to compensate plaintiff for loss of future salary and benefits and career opportunities;

B. An award of damages for mental anguish, humiliation, embarrassment, and emotional injury;

C. An award of punitive damages;

D. An award of reasonable attorneys' fees and the costs of the action; and

E. Such other and further relief as the Court may demand just and proper.

### Count II/Title VII Claim for Retaliation

44. Plaintiff realleges, as if fully set forth in Count II, the allegations of ¶¶ 1 through 38 above.

45. Plaintiff, by being subjected to the adverse treatment by Defendant more particularly described above, was affected in a "term, condition or privilege of employment," as proscribed by 42 U.S.C. § 2000e-2(a)(1), based on the fact that he opposed a practice that he reasonably believed was unlawful under Title VII.

46. As a direct, natural, proximate and foreseeable result of the actions of Defendant,

11

Plaintiff has suffered past and future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.

WHEREFORE, Plaintiff prays that this court will enter a judgment for Plaintiff and against Defendant iStar for the following relief:

    A.    An award of damages, including but not limited to loss of wages, benefits, and promotional opportunities, and reinstatement or an award of front pay to compensate plaintiff for loss of future salary and benefits and career opportunities;

    B.    An award of damages for mental anguish, humiliation, embarrassment, and emotional injury;

    C.    An award of punitive damages;

    D.    An award of reasonable attorneys' fees and the costs of the action; and

    E.    Such other and further relief as the Court may demand just and proper.

### Count III/Title VII Claim for Termination

47. Plaintiff realleges, as if fully set forth in Count III, the allegations of ¶¶ 1 through 38 above.

48. Plaintiff, by being subjected to the adverse treatment by Defendant more particularly described above, was affected in a "term, condition or privilege of employment," as proscribed by 42 U.S.C. § 2000e-2(a)(1), for which his race and color were a substantial motivating factor.

49. As a direct, natural, proximate and foreseeable result of the actions of Defendant, Plaintiff has suffered past and future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.

WHEREFORE, Plaintiff prays that this court will enter a judgment for Plaintiff and against Defendant iStar for the following relief:

A. An award of damages, including but not limited to loss of wages, benefits, and promotional opportunities, and reinstatement or an award of front pay to compensate plaintiff for loss of future salary and benefits and career opportunities;

B. An award of damages for mental anguish, humiliation, embarrassment, and emotional injury;

C. An award of punitive damages;

D. An award of reasonable attorneys' fees and the costs of the action; and

E. Such other and further relief as the Court may demand just and proper.

**Count IV/New York City Human Rights Law Claim for Hostile Environment**

50. Plaintiff realleges and adopts, as if fully set forth in Count IV, the allegations in ¶¶ 1 through 38 above.

51. The acts more particularly alleged in ¶¶ 11 through 30, constitute hostile-environment discrimination as proscribed by the New York City Human Rights Law.

52. The adverse treatment to which Plaintiff was subjected was based upon his being black and African-American.

53. Defendant Baron engaged in the discriminatory practices described above, participated in the discriminatory practices, and aided and abetted the discriminatory practices.

54. The conduct of Defendants deprived Plaintiff of his statutory rights under the New York City Human Rights Law, i.e., Plaintiff, by being subjected to the adverse treatment more particularly alleged above.

55.   As a direct, natural, proximate and foreseeable result of the actions of Defendants, Plaintiff has suffered past and future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.

WHEREFORE, Plaintiff prays that this court will enter a judgment for Plaintiff and against Defendants iStar and Baron for the following relief:

   A.   An award of damages, including but not limited to loss of wages, benefits, and promotional opportunities, and reinstatement or an award of front pay to compensate plaintiff for loss of future salary and benefits and career opportunities;

   B.   An award of damages for mental anguish, humiliation, embarrassment, and emotional injury;

   C.   An award of punitive damages;

   D.   An award of reasonable attorneys' fees and the costs of the action; and

   E.   Such other and further relief as the Court may demand just and proper.

### Count V/New York City Human Rights Claim for Retaliation

56.   Plaintiff realleges, as if fully set forth in Count V, the allegations of ¶¶ 1 through 38 above.

57.   Defendant Baron engaged in the discriminatory practices described above, participated in the discriminatory practices, and aided and abetted the discriminatory practices.

58.   Plaintiff, by being subjected to the adverse treatment by Defendants more particularly described above, was deprived of his rights under the New York City Human Rights Law, based on the fact that he opposed a practice that he reasonably believed was unlawful under the New York City Human Rights Law.

59. As a direct, natural, proximate and foreseeable result of the actions of Defendants, Plaintiff has suffered past and future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.

WHEREFORE, Plaintiff prays that this court will enter a judgment for Plaintiff and against Defendants iStar and Baron for the following relief:

    A. An award of damages, including but not limited to loss of wages, benefits, and promotional opportunities, and reinstatement or an award of front pay to compensate plaintiff for loss of future salary and benefits and career opportunities;

    B. An award of damages for mental anguish, humiliation, embarrassment, and emotional injury;

    C. An award of punitive damages;

    D. An award of reasonable attorneys' fees and the costs of the action; and

    E. Such other and further relief as the Court may demand just and proper.

### Count VI/New York City Human Rights Law Claim for Termination

60. Plaintiff realleges, as if fully set forth in Count VI, the allegations of ¶¶ 1 through 38 above.

61. Defendant Baron engaged in the discriminatory practices described above, participated in the discriminatory practices, and aided and abetted the discriminatory practices.

62. Plaintiff, by being subjected to the adverse treatment by Defendants more particularly described above, was deprived of his rights under the New York City Human Rights Law by his termination, for which his race and color were a substantial motivating factor.

63. As a direct, natural, proximate and foreseeable result of the actions of Defendants,

Plaintiff has suffered past and future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.

WHEREFORE, Plaintiff prays that this court will enter a judgment for Plaintiff and against Defendants iStar and Baron for the following relief:

    A.    An award of damages, including but not limited to loss of wages, benefits, and promotional opportunities, and reinstatement or an award of front pay to compensate plaintiff for loss of future salary and benefits and career opportunities;

    B.    An award of damages for mental anguish, humiliation, embarrassment, and emotional injury;

    C.    An award of punitive damages;

    D.    An award of reasonable attorneys' fees and the costs of the action; and

    E.    Such other and further relief as the Court may demand just and proper.

### Jury Trial Demand

Jury trial is hereby demanded on all counts.

Dated: January 14, 2005

    Respectfully submitted,

    GALLET DREYER & BERKEY LLP
    845 Third Avenue - 8th Floor
    New York, New York 10022
    Tel. (212) 935-3131
    Fax. (212) 935-4514
    Email: dta@gdblaw.com

    By: _____
        David T. Azrin (DA 4747)